[No. F003449. Fifth Dist. July 9, 1985.]

FIREMAN'S FUND INSURANCE COMPANY,
Plaintiff, Cross-defendant and Respondent, v.
CITY OF TURLOCK et al.,
Defendants, Cross-complainants and Appellants;
UNITED STATES FIRE INSURANCE COMPANY,
Cross-defendant and Respondent;
CALIFORNIA UNION INSURANCE COMPANY,
Intervener and Respondent.

**COUNSEL**

Dietrich, Glasrud & Jones and Myron F. Smith for Defendants, Cross-complainants and Appellants.

McCormick, Barstow, Sheppard, Wayte & Carruth and James P. Wagoner for Plaintiff, Cross-defendant and Respondent.

Chinello, Chinello, Shelton & Auchard and Daniel I. Aller III for Cross-defendant and Respondent.

Bronson, Bronson & McKinnon, Paul H. Cyril, Elliot L. Bien and Richard L. Antognini for Intervener and Respondent.

## OPINION

**BEST, J.**—This is an appeal from a judgment entered in favor of plaintiff and cross-defendant Fireman's Fund Insurance Company (hereinafter Fireman's Fund), intervener California Union Insurance Company (hereinafter Cal. Union), and cross-defendant United States Fire Insurance Company (hereinafter U. S. Fire). Said judgment was based upon each of the above-named parties' successful motion for summary judgment against defendant and cross-complainant City of Turlock (hereinafter City) and Lou Ann Watson.

This is an action for declaratory relief to determine if insurance coverage was provided to City for acts and/or events transpiring in 1975 surrounding the firing, reinstatement and termination of Charles Polston.

### STATEMENT OF FACTS

The action arises out of the December 1974 termination of Charles Polston's employment as a police officer with City. Polston appealed the termination to the Turlock City Council and a hearing was held. Watson was the city attorney for City at all relevant times.

At the commencement of the second session of the hearing, Polston's counsel approached Watson to explore the possibility of settling the matter. Watson then undertook extensive negotiations on City's behalf, and eventually the claim was settled. One of the settlement terms provided that City would reinstate Polston retroactively, but that Polston would secretly submit to City a signed letter of resignation to become effective on June 1, 1975.

A dispute arose between Polston and City as to the particular terms of this agreement. Polston contended that the agreement provided for his secret resignation to remain confidential forever. City and Watson contended that the resignation was to remain confidential only until June 1, 1975, the resignation's effective date.

Sometime after June 1, 1975, Watson disclosed the previously arranged secret resignation to reporters from the Modesto Bee, the Fresno Bee and the Turlock Journal. Polston filed a claim with the Turlock City Council for breach of the secrecy agreement, and the city council denied the claim.

Polston then filed suit in the Stanislaus County Superior Court seeking damages for breach of contract and for fraud. In that action, a jury awarded Polston damages against City on the breach-of-contract cause of action and against both City and Watson on the fraud cause of action. These awards,

modified by a remittitur on the breach-of-contract cause of action, were upheld on appeal by this court. The California Supreme Court denied a petition for hearing, and the judgment is now final.[1]

City has defended Watson's actions with respect to Polston, has never disciplined or reprimanded her for those actions and retained her in her position as city attorney. While the "Polston v. City of Turlock" action was pending, Fireman's Fund filed suit for declaratory relief in the Stanislaus County Superior Court. Fireman's Fund sought a judicial determination of its rights and obligations with respect to the "Polston v. City of Turlock" action under a comprehensive general liability policy Fireman's Fund had issued to City. City filed a cross-complaint naming its umbrella carrier for the time period in question, U. S. Fire, as a cross-defendant and seeking a declaratory relief judgment against said umbrella carrier, claiming that said policy provides coverage to City for the events in question. Thereafter, Watson's errors and omissions carrier, Cal. Union, intervened in this action seeking a declaration of its rights and obligations for the Polston verdicts, if any, to both City and Watson.

DISCUSSION

I

*Did the trial court err in granting the
summary judgment motions?*

A.  *Standard of review.*

The rules governing the summary judgment procedure have been succinctly stated on numerous occasions.

■  "We have summarized the well-established rules governing summary judgment procedure as follows: ' "The matter to be determined by the trial court in considering such a motion is whether the defendant (or the plaintiff) has presented any facts which give rise to a triable issue. The court may not pass upon the issue itself. Summary judgment is proper only if the affidavits in support of the moving party would be sufficient to sustain a judgment in his favor and his opponent does not by affidavit show such facts as may be deemed by the judge hearing the motion sufficient to present a triable issue. The aim of the procedure is to discover, through the media of affidavits, whether the parties possess evidence requiring the weighing

---

[1] Fireman's Fund requests that this court take judicial notice of the clerk's transcript and all other papers on file with this court in the "Polston v. City of Turlock" action.

procedures of a trial. In examining the sufficiency of affidavits filed in connection with the motion, the affidavits of the moving party are strictly construed and those of his opponent liberally construed, and doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. Such summary procedure is drastic and should be used with caution so that it does not become a substitute for the open trial method of determining facts." ' (*Corwin* v. *Los Angeles Newspaper Service Bureau, Inc.* 4 Cal.3d 842, 851-852 [94 Cal.Rptr. 785, 484 P.2d 953].)" (*Empire West* v. *Southern California Gas Co.* (1974) 12 Cal.3d 805, 808 [117 Cal.Rptr. 423, 528 P.2d 31].)

■ As stated above, to be granted summary judgment the moving party's supporting papers must be sufficient to sustain a judgment in his favor. When the defendant is the moving party, his task is to negate completely an essential element of plaintiff's case or to establish a complete defense. (*Saatzer* v. *Smith* (1981) 122 Cal.App.3d 512, 517 [176 Cal.Rptr. 68].) This task is limited to addressing those issues or theories of liability raised in plaintiff's complaint. The papers filed by the party opposing summary judgment must also be directed to the issues raised in the complaint; therefore, the opposing papers may not create issues outside of the pleadings. (*Willard* v. *Hagemeister* (1981) 121 Cal.App.3d 406, 414 [175 Cal.Rptr. 365]; *IT Corp.* v. *Superior Court* (1978) 83 Cal.App.3d 443, 451-452 [147 Cal.Rptr. 828]; *Keniston* v. *American Nat. Ins. Co.* (1973) 31 Cal.App.3d 803, 812 [107 Cal.Rptr. 583].)

### B. *Is the breach-of-contract verdict covered by the Fireman's Fund policy?*

City argues that three provisions of the Fireman's Fund policy provide coverage for City's liability to Polston: the comprehensive general liability provision, the personal injury liability endorsement and the contractual liability endorsement.

The parties agree that one case (it appears the only case) has addressed insurance policy language similar to that which we have here. In *International Surplus Lines Ins. Co.* v. *Devonshire Coverage Corp.* (1979) 93 Cal.App.3d 601 [155 Cal.Rptr. 870], the issue was whether a Hartford Insurance policy issued to Devonshire covered Devonshire's liability to Central National Insurance Company of Omaha. Devonshire had issued to Central a fire insurance policy for a Pennsylvania business. Devonshire's agreement with Central provided that Devonshire would either obtain reinsurance or indemnify Central for risks in excess of $500,000. Devonshire never obtained reinsurance, and Central prevailed in a suit for indemnity

when a fire to the Pennsylvania business caused over $1 million in damages. Devonshire's coverage action against Hartford followed.

■ As in the present case, the Hartford policy in question covered general liability, and an endorsement reached liability assumed by contract. The policy's insuring language extended coverage only to amounts that the insured "shall become legally obligated to pay as damages." The court construed this phrase to be synonymous with language that an insurer was obligated to pay "damages for liability imposed by law." Both phrases, the court noted, have been uniformly interpreted as referring to liability "ex delicto" as distinguished from "ex contractu." Thus, the policy covered tort, but not contract liability. (*Devonshire Coverage Corp., supra,* 93 Cal.App.3d at p. 611; see also *Ritchie v. Anchor Casualty Co.* (1955) 135 Cal.App.2d 245, 254-257 [286 P.2d 1000].)

The Fireman's Fund policy in the present case includes the same phrase in the insuring paragraph that was found controlling in *Devonshire;* coverage is provided only for amounts that the insured "shall become legally obligated to pay as damages." Thus, under *Devonshire,* standard liability policies such as the Fireman's Fund policy involved herein cover only tort liabilities, and not those in contract.

City contends, and Fireman's Fund agrees, that in determining whether the contract verdict sounds in tort or in contract under the *Devonshire* case, the court must determine the "nature of the damages" awarded. (*International Surplus Lines Ins. Co. v. Devonshire Coverage Corp., supra,* 93 Cal.App.3d at p. 610.)

City is incorrect in its contention that the determination of the "nature of the damages" is a factual question. In *Devonshire,* as in the present case, an analysis of the liability underlying the award determines as a matter of law the nature of the damages.

In *Devonshire,* the court held that Devonshire's liability to Central was purely contractual. In the court's view, only three theories could support the judgment against Devonshire: First, a negligent failure to obtain the insurance; second, Devonshire's breach of its agreement to assume a portion of Central's obligation to the business injured by the fire; and third, Devonshire's breach of its agreement to pay Central the excess over $500,000. (*Devonshire, supra,* 93 Cal.App.3d at p. 611.) Under each of these theories, Devonshire's liability depended upon the existence of a contractual duty. Therefore, the Hartford policy, with or without its contractual liability endorsement, did not cover the damages awarded against Devonshire.

■ Here, the same analysis results in the same conclusion. The jury in the underlying action awarded damages caused by Watson's disclosure that City had conditioned Polston's reinstatement upon his subsequent resignation. The jury found that this disclosure violated the agreement between Polston and City. The critical point is that absent the promise not to disclose City could not have been liable for the disclosure.

It is clear that the jury's finding that City was liable for breach of contract formed the "basis of the judgment" against City which it in turn now seeks to bring within the coverage of the Fireman's Fund policy. Although, as City points out, there are tort legal theories which could have been argued by Polston, such theories are immaterial to the extent that the judgment obtained by Polston was based on breach of contract, not an invasion of privacy or some other tort. As stated in *Rafeiro* v. *American Employers' Ins. Co.* (1970) 5 Cal.App.3d 799, 805 [85 Cal.Rptr. 701]:

"Plaintiff's approach misses the mark. The issue in this case is not whether the apartments in fact suffered any diminution in value within the principles discussed below, but whether the judgment, upon which plaintiff seeks to recover, represents damages of a type for which the insurer agreed to indemnify the contractor. The plaintiff is in court as a beneficiary of the contract between the contractor and the insurer, and must bring her claim— the judgment—within the terms of that contract. [Citations.] Her subsequent unadjudicated claims concerning the nature of her damages cannot affect the record made in the prior suit."

City argues that the jury verdicts are nothing more than labels and that character and reputation damages are not recoverable in a contract action. However, this issue was fully litigated in the underlying action, and this court followed the authority of recent California cases in finding the damages recoverable if proximately and foreseeably caused by the breach. (*Wynn* v. *Monterey Club* (1980) 111 Cal.App.3d 789, 799-800 [168 Cal.Rptr. 878]; *Windeler* v. *Scheers Jewelers* (1970) 8 Cal.App.3d 844 [88 Cal.Rptr. 39].) As this court explained in affirming Polston's judgment against City for breach of contract:

"The terms of the oral secrecy agreement involved the 'personal feelings' of Polston, justifying a jury instruction on damages for emotional distress. Watson knew of the importance Polston placed on his position as a police officer. She also knew his integrity had been questioned because of the incident involving the car accident and exchange of money between drivers, and the personal feelings felt by Polston when he was terminated for what he thought was retaliation for his disclosure of Ladd's unauthorized use of impounded property. Watson also was well aware of the importance of

maintaining secrecy if Polston were to find other employment in law enforcement.

"Under these circumstances, Watson was put on notice of the grave consequences a breach of the secrecy agreement would have on Polston's future career as a police officer; and the concomitant emotional impact Polston would suffer. The trial court was not in error in instructing the jury it could award damages for emotional distress resulting from the breach of contract."

Thus, it appears of no significance that the jury noted on its verdict sheet that the contract damages were based upon injury to character and reputation. The law of the case is that the jury could properly consider injury to character and reputation in evaluating Polston's contract damages for emotional distress.

City then contends, without analysis or citation to authority, that the plain meaning of the phrase "violation of an individual's right of privacy" in the policy's personal injury endorsement includes not only the tort of invasion of privacy, but also "any conduct which reveals something which was to have been kept secret." However, the language in the policy does not support this construction.

As noted in *Devonshire,* coverage under the personal injury endorsement is limited by the phrase in the insuring language of the endorsement to "sums which the insured shall become legally obligated to pay as damages." Thus, under *Devonshire,* coverage exists only where there is tort liability.

In this case, the language concerning violations of an individual's right of privacy is surrounded exclusively by terms that designate legal causes of action: "The Company will pay on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages* because of injury (herein called '*personal injury*') sustained by any person or organization and arising out of one or more of the following offenses . . . .

"Group A—false arrest, detention or imprisonment, or malicious prosecution;

"Group B—the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the *named insured;*

"Group C—wrongful entry or eviction, or other invasion of the right of private occupancy; . . ." (Italics in original.) When examined in the context of these other legal terms, the plain meaning of "violation of an individual's right of privacy" includes only violations that incur tort liability. In the instant case, Watson's disclosure did not constitute libel or slander, since all of the facts disclosed were true. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 292, pp. 2564-2565.) Nor did Polston seek to predicate liability by way of a cause of action for an invasion of privacy, because clearly the matter was one of public interest and concern. (*Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 812-813 [163 Cal.Rptr. 628, 608 P.2d 716]; *Johnson* v. *Harcourt, Brace, Jovanovich, Inc.* (1974) 43 Cal.App.3d 880, 890-891 [118 Cal.Rptr. 370]; Witkin, *op. cit. supra,* at pp. 2606-2607.) Thus, the liability of City is purely contractual and is beyond the coverage provided by the Fireman's Fund policy.

Finally, City asserts that because of the policy's contractual liability endorsement, a material issue of fact exists as to whether Polston and City memorialized their agreement in writing. Again, however, it appears that the *Devonshire* case is dispositive of this issue. There, it was held that a contractual liability endorsement limited to amounts that the insured "shall become legally obligated to pay as damages" covers only tort liabilities. More specifically, the endorsement covers third party tort liabilities that the insured assumes by contract. (*Devonshire, supra,* 93 Cal.App.3d at pp. 609-611.) The contractual liability endorsement to the Fireman's Fund policy contains the same language construed by the court in *Devonshire*. Consequently, the policy and endorsement provide coverage only where there is tort liability; it is irrelevant whether the contract formed between Polston and City was written or not because the policy simply does not cover purely contractual liability.

### C. *Is the breach-of-contract verdict covered by the U. S. Fire policy?*

City raises essentially the same contentions as to the U. S. Fire policy of insurance. Therefore, the same analysis and conclusion that is reached as to issue B should apply to issue C with the possible exception of U. S. Fire's possible liability coverage based on contracts.

The U. S. Fire policy provides insurance coverage for certain acts in an amount of $1 million in excess of the Fireman's Fund policy previously discussed, which had limits of $250,000 for each person and $500,000 for each occurrence. Where underlying insurance did not apply, the U. S. Fire policy was to be in excess of the retained limit of $10,000. Among other provisions, the policy provides: "The company agrees to indemnify the

insured for ultimate net loss in excess of the retained limit hereinafter stated, which the insured may sustain by reason of the liability imposed upon the insured by law, or *assumed by the insured under contract:*

"(a) Personal Injury Liability. For damages, including damages for care and loss of services, because of personal injury, including death anytime resulting therefrom, sustained by any person or persons;

"(b) Property Damage Liability. For damages because of injury to or destruction of tangible property including consequential loss resulting therefrom, caused by an occurrence; . . ." (Italics added.) These particular coverages are referred to as "coverage 1(a) and 1(b)." The policy provides further: "(d) Occurrence. With respect to coverage 1(a) and 1(b) 'occurrence' means either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to the persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The U. S. Fire policy does not provide coverage for indemnity for a "violation of the right to privacy" as does the underlying Fireman's Fund policy, but does provide: "(c) Advertising Liability. For damages because of libel, slander, defamation, infringement of copyright, title or slogan, piracy, unfair competition, idea misappropriation or invasion of rights of privacy arising out of the named insured's advertising activities."

City contends that the *Devonshire* case, *supra,* 93 Cal.App.3d 601, is inapplicable to the U. S. Fire policy. U. S. Fire, on the other hand, contends that *Devonshire* controls this case and that the policy applies only to tort liabilities.

Focusing on the language "or assumed by the insured under contract," City contends that these liabilities must arise as the result of an occurrence or event under the policy and result in damages for which coverage is provided. City further contends as to U. S. Fire that the events in question constitute a liability assumed by the insured City under a contract. City, however, does not cite any authority for its position.

■ Contrary to City's contention, the language of the policy, although not identical to the language in the Fireman's Fund policy or the *Devonshire* case policy, is in essence a liability policy covering tort liabilities. The words "or assumed by the insured under contract" have the same meaning as Devonshire's and Fireman's Fund's contractual liability endorsement. As discussed earlier, such an endorsement only covers third party tort liabilities that the insured assumes by contract. Also as previously discussed, the un-

derlying judgment was based purely upon a breach of contract and not tort liability.

### D. *Is the fraud verdict covered by the Fireman's Fund policy and/or the U. S. Fire policy?*

**(6)** Insurance Code section 533 states in pertinent part that "An insurer is not liable for a loss caused by the willful act of the insured; . . ." The courts consider this provision to be the equivalent of an exclusionary clause contained within every insurance contract. (*Allstate Insurance Co.* v. *Kim W.* (1984) 160 Cal.App.3d 326, 331 [206 Cal.Rptr. 609].) A "willful act" under section 533 " ' ' "connotes something more blameworthy than . . . ordinary negligence, and something more than the mere intentional doing of an act constituting such negligence." ' ' " (*Id.,* at p. 332.)

In this case, City and Watson do not dispute that the fraud verdict in "Polston v. City of Turlock" was based upon a willful act by Watson sufficient to invoke the exclusion of Insurance Code section 533. The fraud consisted of a promise made without an intent to perform; more specifically, Watson promised on behalf of City to hold in confidence the terms of City's settlement agreement with Polston.

What City and Watson do dispute, however, is whether Insurance Code section 533 precludes coverage for City under the insurance policies.

In the underlying Polston trial, the trial court instructed the jury:

"The defendants are sued as principal and agent, the Defendant, City of Turlock, as principal and Defendant, Lou Ann Watson, as its agent.

". . . . . . . . . . . . . . . . . . . . . . . .

"If you determine that Defendant, Lou Ann Watson, is liable in the fraud action, then you must find that Defendant, City of Turlock, is also liable. However, if you determine that Defendant, Lou Ann Watson, is not liable in the fraud action, then you must find that Defendant, City of Turlock, is not liable.

"It is established that Lou Ann Watson was the agent of Defendant City of Turlock. Therefore, any act or omission of Lou Ann Watson was in law the act or omission of Defendant City of Turlock."

These instructions make it clear that in the underlying judgment, which is the basis of this declaratory relief action, the jury verdict against City on the fraud cause of action for which coverage is being sought was rendered

on the theory of respondeat superior. City contends that Insurance Code section 533 does not bar coverage for a principal when liability is imposed upon said principal based upon respondeat superior, relying upon *Arenson v. Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81 [286 P.2d 816] and *Dart Industries, Inc.* v. *Liberty Mutual Insurance Co.* (9th Cir. 1973) 484 F.2d 1295.

In *Arenson, supra,* the California Supreme Court dealt with the liability of a parent for the intentional tort (arson) of the parent's child. Judgment was rendered against the parent. Arenson's homeowner's insurer (National) refused to pay the verdict rendered against the father on the basis that Insurance Code section 533 precluded insurance coverage. The court held:

"Section 533 of the Insurance Code, which codifies the general rule that an insurance policy indemnifying the insured against liability due to his own wilful wrong is void as against public policy, has no application to a situation where the plaintiff is not personally at fault." (*Arenson* v. *Nat. Automobile & Cas. Ins. Co., supra,* 45 Cal.2d at p. 84, fn. omitted.)

The *Arenson* holding was applied to a respondeat superior situation in the *Dart Industries* case, *supra,* where the court held that an insurance carrier was liable for payment of the damages rendered against a corporation on a libel judgment. The court found that Dart Industries' liability was based upon respondeat superior and, as such, found that Insurance Code section 533 did not bar coverage.

Acknowledging the *Arenson* exception to Insurance Code section 533, Fireman's Fund contends that City is directly liable for Watson's fraud based on theories of authorization, managerial capacity and ratification. U. S. Fire contends that the jury in the underlying action found that Polston had been wronged by the intentional acts of both City and Watson. Both contentions are contrary to the record. As we have previously noted, under the instructions given by the court, the jury's verdict against City on the fraud cause of action was necessarily predicated upon vicarious liability under the doctrine of respondeat superior and not upon City's own intentional acts. ■ Under the *Arenson* holding, it follows that indemnification for City's liability for the verdict and judgment on the fraud cause of action is not precluded by Insurance Code section 533.

E. *Does the evidence presented in support of the motion for
summary judgment establish City's liability for
Watson's fraud as a matter of law?*

Fireman's Fund and U. S. Fire contend that City is directly liable for Watson's fraudulent promise, made without any intention of performing it,

and, therefore, coverage under both policies is precluded by Insurance Code section 533. They rely upon the oral deposition testimony of Watson to establish, as a matter of law, that City authorized the fraudulent promise by Watson, that City ratified Watson's fraudulent promise, and that Watson was employed in a managerial capacity and made the fraudulent promise while acting within the scope of her employment. (See *Spahn* v. *Guild Industries Corp.* (1979) 94 Cal.App.3d 143, 156 [156 Cal.Rptr. 375]; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Agency and Employment, § 153, p. 753.)

At deposition, Watson testified that the understanding of herself and of the city council was that Polston's reinstatement in exchange for his post-dated resignation was only to be kept confidential from the public until the resignation became effective on June 1, 1975:

"A. As to the resignation, my position is the agreement was that the resignation would be kept confidential until June the 1st, when it would be filed through the regular personnel channels, and he would be resigned.

"Q. Did you have any understanding as to whether the fact that this resignation was a part of the compromise was supposed to be confidential?

"A. That was not discussed at all. I did not understand that it was not to be disclosed.

"Q. Well, obviously you couldn't have disclosed that up until June 1st, because that would have been disclosing the resignation itself; is that right?

"A. That is right.

"Q. But once the resignation was disclosed you were of the belief that the agreement did not prohibit you from disclosing that the resignation had in fact been agreed to back in April?

"A. That is right."

Watson's testimony that there was no agreement to keep the compromise agreement confidential after June 1, 1975, can hardly be construed as establishing City's authorization for her to promise to keep the same matter confidential without any intention of keeping the promise.

■ A principal ratifies an agent's acts when *he knows of the acts* and accepts the benefits which flow from them. (*Spahn* v. *Guild Industries Corp.*, *supra*, 94 Cal.App.3d 143, 157.) Again, Watson's denial that a

promise of confidentiality was made to Polston can hardly be said to establish City's knowledge that she made such a promise.

Watson testified at deposition that she was employed by City as part-time city attorney spending a maximum of 50 percent of her time on work for City. She described her duties as city attorney as follows: "It was to handle anything that came up except personal injury and Workers' Compensation; and I think we had the term special litigation in there, because I told them there were areas that I just couldn't handle, you know, some lawsuits that might be filed against the City. For those there would either be additional compensation or hire outside attorneys. And that I would attend the City Council meetings and advise the department heads, City Manager."

With reference to the Polston agreement, Watson's deposition testimony was: "I didn't have any authority to make any agreement; all I could do was hear what he wanted and present it to the Council."

Watson's deposition testimony is insufficient to establish as a matter of law that she was employed in a managerial capacity or that the fraudulent promise was within the scope of her authority.

Having determined that triable issues of fact exist on the question of City's direct liability to Polston for fraud, we deem it unnecessary to address City's contention that Fireman's Fund did not sufficiently reserve its rights to assert the issue of noncoverage. That is a question to be determined by the trial court upon remand.

### F. *Is the breach-of-contract verdict covered by the Cal. Union policy?*

In the underlying Polston action, the verdict on the breach of contract was rendered solely against City, and not Watson. ■ Nevertheless, City contends that under Watson's errors and omissions policy, coverage is provided for City. Watson's errors and omissions policy provides that Cal. Union agrees: "To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages as a result of any claim made against the insured or any person, firm or corporation for whom the insured is legally liable, by reason of any act, error or omission in professional services rendered or which should have been rendered by the insured, his employees or by others for whom he is liable, in the conduct of the insured's profession as an: Attorney . . . ."

It is clear that the policy provides coverage to Watson for claims made as the result of an act, error or omission in rendering professional services.

However, it does not appear that coverage is extended to claims made against other persons, firms or corporations unless the insured (Watson) is legally liable. City contends that Watson, under the verdict rendered in the underlying Polston action, is legally liable under respondeat superior principles to City for the acts in question, i.e., breach of contract. City contends that Watson's acts, errors or omissions formed the basis of the judgment which was rendered on the first cause of action and, therefore, submit that the Cal. Union policy provides coverage under the insuring agreement to City. City cites no cases to support its contention.

While Watson may be subject to legal liability to City under general respondeat superior principles, that legal liability has not yet been established. Indeed, the record fails to indicate that City has even made a claim against Watson for indemnification for the underlying Polston judgment against City.

City is not a named insured nor an additional insured under the terms of the policy. Until such time as a final judgment was entered in favor of City and against Watson, no cause of action could be maintained by City against Cal. Union on the policy. (Ins. Code, § 11580, subd. (b)(2); *Malmgren* v. *Southwestern Auto Ins. Co.* (1932) 126 Cal.App. 135, 139 [14 P.2d 351]; *Zander* v. *Texaco, Inc.* (1968) 259 Cal.App.2d 793, 807 [66 Cal.Rptr. 561].) Here, City is attempting to reach Watson's insurance policy without having first secured a final judgment against Watson. That it cannot do.

Furthermore, even assuming there was coverage under the terms of the Cal. Union policy, that policy cannot benefit either City or its own carriers because neither City nor its insurers should be allowed to benefit from its employee's insurance. Government Code section 825 provides that a public entity is required to indemnify its employee and provide him a defense and not the other way around. For this reason, it has been held that neither the public entity nor its liability carriers can seek to recover from the liability carrier of the entity's employee. (*Pacific Indem. Co.* v. *American Mut. Ins. Co.* (1972) 28 Cal.App.3d 983, 992 [105 Cal.Rptr. 295].)

In *Pacific Indem. Co.,* the University of California and a doctor it had employed were sued for malpractice. After the lawsuit was settled by the university's malpractice carrier, it sought to recover the cost of defense and settlement from the malpractice carrier for the doctor, arguing that it was excess and the doctor's carrier was primary. The court rejected this proposition, holding that under Government Code section 825, the employee, the doctor in that instance, was entitled to a defense and indemnification in any event, thus making the university's carrier primary. The court stated: "[T]here is no good reason why the employer's insurer should benefit from

the prudence of the public employee in providing himself with liability insurance which would cover his acts or omissions which were not within the scope of his employment, or in the event he was charged with actual fraud, corruption or malice, and which would provide him with coverage in addition to that furnished by the public employer if a claim exceeded that so furnished. [Citation.] In fact, if the Regents and the plaintiff insurer had failed to assume the employee's defense and pay the claim, and the defendant insurer did so, it would appear to have a right over against the Regents by subrogation to the rights of the employee under sections 825.2 and 996.4 of the Government Code." (*Pacific Indem. Co., supra,* 28 Cal.App.3d at p. 992.)

The court also distinguished the case relied upon by City in its reply brief, *Oxnard Union High Sch. Dist.* v. *Teachers Ins. Co.* (1971) 20 Cal.App.3d 842 [99 Cal.Rptr. 478], as follows: "On the other hand, in *Oxnard Union High Sch. Dist.* v. *Teachers Ins. Co., supra,* 20 Cal.App.3d 842 . . . after an action against the public employee, whom the employer refused to defend, and against the employing public entity had been settled, the trial court, to whom the matter was submitted, determined, on the basis of the policy provisions, that the employee's insurer was liable to its full limit, and the employer's insurer was only liable for the excess, and that the liability for attorneys' fees and court costs should be divided by the two insurers proportionately to the principal liabilities as so determined. The Court of Appeal affirmed that determination. The appellate court observed, 'The rationale for this determination was that Teachers' insurance policy covering Farrow and the District as an additional insured afforded primary coverage and United's insurance company covering the District afforded only coverage excess to that provided by Teachers ($100,000). [¶] Teachers does not challenge this result on the ground that the court misconstrued the two insurance polices.' . . . That decision may be distinguished from this case on the ground that there the employee's insurance admittedly covered the employer who is primarily liable under the statutes. In this case, however, there is nothing in the certificate issued by defendant insurer which purports to cover the Regents." (*Pacific Indem. Co.* v. *American Mut. Ins. Co., supra,* 28 Cal.App.3d at pp. 994-995.)

## DISPOSITION

While we agree with the trial court to the extent that by its judgment no coverage was provided to the City of Turlock for breach of contract damages, we find that triable issues of fact exist on the question of the City's direct liability for the fraud damages.

Accordingly, the judgment in favor of Fireman's Fund Insurance Company and United States Fire Insurance Company against the City of Turlock is reversed, each of said parties to bear its own costs.

The judgment in favor of Fireman's Fund Insurance Company and United States Fire Insurance Company against Lou Ann Watson is affirmed.

The judgment in favor of intervener, California Union Insurance Company, is affirmed, intervener to have its costs.

Hanson (P. D.), Acting P. J., and Hamlin, J., concurred.